# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

John W. Klein II,

            Plaintiff

    v.

Commissioner of SSA,

            Defendant

CIVIL ACTION NO. 1:14-CV-01496

(CONNER, C.J.)
(MEHALCHICK, M.J.)

## REPORT AND RECOMMENDATION

This is an action brought under Section 205(g) of the Social Security Act, 42 U.S.C. §405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff John W. Klein's ("Plaintiff") claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This matter has been referred to the undersigned Magistrate Judge for resolution pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.

For the reasons stated herein, it is recommended that the decision of the Commissioner be **VACATED** and this case be **REMANDED** for a new administrative hearing.

I.    **BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff has a history of lower back problems dating back to 1994. (Admin. Tr. 159; Doc. 14-7 p. 3). This condition did not preclude Plaintiff from working, however, until he injured his neck, mid and lower back, and left shoulder at work attempting to lift a heavy object. *Id.* Plaintiff settled his workers' compensation claim in 2011. (Admin. Tr. 115; Doc. 14-5 p. 31). Plaintiff applied for and collected unemployment while his workers' compensation claim was pending. (Admin. Tr. 42-43; Doc. 14-2 pp. 43-44)

On April 27, 2010, Plaintiff was initially examined by orthopedic surgeon, Dr. Howard Baum with complaints of injury to his neck, mid and lower back, and left shoulder. (Admin. Tr. 159; Doc. 14-7 p. 3). On physical examination, Plaintiff exhibited a restriction of motion and tenderness in his cervical and lumbar spine, and paralumbar guarding. Plaintiff's straight leg testing was guarded to 60/80 degrees of normal. He also exhibited a positive impingement sign, restricted range of motion, and guarding in his left shoulder. Dr. Baum assessed cervical thoraco-lumbar derangement and left shoulder impairment. At the conclusion of his examination, Dr. Baum opined that Plaintiff was "disabled."

On May 6, 2010, an MRI of Plaintiff's lumbar spine revealed slight anterior spondylolisthesis at L5-S1 with a small central disc herniation and peripheral annular tear. (Admin. Tr. 217-18; Doc. 14-7 pp. 61-62). On May 8, 2010, an MRI of Plaintiff's thoracic spine revealed the impression of disc herniation at T5/T6, T7/T8, and T10/T11, as well as a mild disc bulge at T9/T10. (Admin. Tr. 215-16; Doc. 14-7 pp. 59-60).

On May 17, 2010, Plaintiff presented to Dr. Baum for a follow-up appointment related to his neck and back, and shoulder injuries. (Admin. Tr. 200; Doc. 14-7 p. 44). Plaintiff complained of new referred pain to his left shoulder with "twitching" in his left hand. Plaintiff's physical examination showed no change from his April 2010 examination. Dr. Baum diagnosed cervical, thoraco-lumbar derangement, L5-S1 though T11 disc herniation, and a "rule out" diagnosis of radiculopathy. Dr. Baum also administered a cortisone injection to the left side of Plaintiff's thoracic spine.

On June 7, 2010, Plaintiff presented to Dr. Baum with complaints of pain in his neck and left shoulder. Plaintiff reported that he was seeing some relief with medication. (Admin. Tr. 201; Doc. 14-7 p. 45). On examination Plaintiff exhibited guarded motion in his left shoulder reaching 90/160-180 degrees of abduction and flexion, and left parascapular and cervical-thoracic musculature pain.

Dr. Baum diagnosed thoracic spine multi-level disc herniation, lumbar derangement with spondylolisthesis, and a "rule out" diagnosis of cervical spine disc HNP. Dr. Baum also administered a cortisone injection to Plaintiff's left shoulder. Plaintiff did not feel any significant improvement following the injection.

On July 22, 2010, Plaintiff presented to Dr. Baum with complaints of mid and low back pain, neck pain and left arm numbness and spasm. (Admin. Tr. 202; Doc. 14-7 p. 46). On examination Dr. Baum observed guarding, spasm, and tenderness in Plaintiff's cervical and lumbar spine. Dr. Baum diagnosed multilevel thoracic HNP at T5, T6, T7, T8, and T10, lumbar spine spondylolisthesis at L5-S1, and a "rule out" diagnosis of cervical HNP. He also opined that Plaintiff was "disabled." Dr. Baum ordered an MRI of Plaintiff's cervical spine, which revealed the impression of spinal stenosis with likely nerve root impingement at C4/C5, C5/C6, and C6/C7. (Admin. Tr. 162; Doc. 14-7 p. 5-6).

On September 30, 2010, Plaintiff presented to Dr. Baum with complaints of increased neck and back pain that worsened with activity. (Admin. Tr. 163; Doc. 14-7 p. 7). On physical examination, Plaintiff was positive for spasm, guarding, and tenderness in his cervical, thoracic, and lumbar spine, and positive for guarded left shoulder motion at 90/160 degrees of abduction flexion. Dr. Baum diagnosed Plaintiff with left shoulder impingement and cervical, thoracic, and lumbar HNP. He also opined that Plaintiff was "disabled." Dr. Baum administered a cortisone injection to Plaintiff's left shoulder and ordered a nerve conduction study.

On October 1, 2010, a nerve conduction study revealed electrophysiologic evidence of moderate left sensorimotor cubital tunnel syndrome primarily affecting myelin. (Admin. Tr. 164-66; Doc. 14-7 p. 8-10).

3

On October 21, 2010, Plaintiff was examined by Dr. Baum with complaints of neck pain and mid to lower back pain with increased activity. (Admin. Tr. 170; Doc. 14-7 p. 14). On physical exam Plaintiff exhibited spasm, guarding and tenderness over the neck and back region, and guarded left shoulder motion reaching to 90/160 degrees of flexion and abduction. Based on the October 1, 2010, nerve conduction study, Dr. Baum added a diagnosis of left cubital tunnel syndrome. Dr. Baum administered a cortisone injection and multiple trigger point injections to the left side of Plaintiff's mid-back, upper back, and neck, requested authorization for a left shoulder arthroscopy, and noted that Plaintiff was "disabled."

On December 16, 2010, Plaintiff was examined by Dr. Baum with complaints of increased lower back pain; his condition was otherwise unchanged. (Admin. Tr. 171; Doc. 14-7 p. 15). On physical exam it was noted that Plaintiff exhibited spasm, guarding and tenderness over the neck and back region, and guarded left shoulder motion reaching to 90/160 degrees of flexion and abduction. Dr. Baum diagnosed multi-level cervical, thoraco-lumbar HNP, left sided cubital tunnel syndrome, and a "rule out" diagnosis of lower extremity radiculopathy and requested authorization to perform left cubital tunnel release surgery. Dr. Baum opined that Plaintiff remained disabled.

On January 13, 2011, Plaintiff was examined by Dr. Baum with complaints of neck and back pain with radiation of tingling to the left elbow, upper extremities and lower extremities, and shoulder pain. (Admin. Tr. 172; Doc. 14-7 p. 16). On physical examination Plaintiff exhibited guarded left shoulder motion to 90/160 degrees of flexion and abduction. Plaintiff's left elbow demonstrated a positive Tinel's sign. Dr. Baum diagnosed left elbow cubital tunnel syndrome, left shoulder impingement, and multi-level cervical, thoraco-lumbar HNP. Dr. Baum administered a cortisone injection to Plaintiff's left shoulder, and requested authorization for left shoulder anterior

4

acromioplasty and left elbow cubital tunnel release. Dr. Baum opined that Plaintiff remained disabled.

On the same date, Plaintiff was examined by pain management specialist Dr. Mehrdad Hedayatnia following a referral from Dr. Baum. (Admin. Tr. 192-93; Doc. 14-7 pp. 36-37). Dr. Hedayatnia observed that Plaintiff had a decreased range of motion in his lumbar and cervical spine, and moderate to severe paraspinal muscle spasm. Dr. Hedayatnia administered cortisone injections to Plaintiff's cervical spine between the C7 and T1 vertebrae, multiple trigger point injections, and bilateral paravertebral injections at the L2 and L4 levels. Plaintiff had a second round of injections in February 2011, and reported a 20 to 30% improvement in his pain. (Admin. Tr. 194-95; Doc. 14-7 pp. 38-39).

On March 3, 2011, Plaintiff was examined by Dr. Baum with complaints of continued neck and back pain. (Admin. Tr. 173; Doc. 14-7 p. 17). Plaintiff also reported persistent left elbow and shoulder pain. On physical examination Dr. Baum noted that Plaintiff exhibited guarded left shoulder motion to 90/160 degrees of flexion and abduction, guarded neck and back (cervical and lumbar spine) motion with spasm and tenderness, and a positive Tinel's sign in the left cubital region. Dr. Baum requested authorization for a left shoulder anterior acromioplasty and left elbow cubital tunnel release, but recommended that Plaintiff continue with conservative care in the interim, and opined that Plaintiff was disabled.

On June 16, 2011, Plaintiff protectively filed an application for DIB alleging that beginning April 16, 2010, due to pain in his left shoulder, left elbow, left wrist, neck, and back as a result of degenerative disc disease/degenerative joint disorder of the cervical, thoracic, and lumbar spine, left shoulder larval tear with impingement, and left cubital tunnel syndrome/status post cubital tunnel release, he was no longer able to work.

On the same date, Plaintiff was examined by Dr. Baum with complaints of neck, back, and shoulder pain radiating to his upper left extremity with numbness and tingling. (Admin. Tr. 174; Doc. 14-7 p. 18). Dr. Baum noted that Plaintiff's left shoulder motion was restricted to 90 degrees on flexion and abduction, and that Plaintiff was positive for impingement, spasm, guarding, and tenderness. Plaintiff had a positive straight leg raise test at 50 degrees to the lumbar spine. Dr. Baum noted that Plaintiff remained disabled, and recommended that Plaintiff continue with his exercise and therapeutic regimen. Dr. Baum also noted that he would like authorization to perform shoulder arthroscopy and left elbow cubital tunnel release.

On July 22, 2011, Plaintiff underwent left cubital tunnel release surgery. (Admin. Tr. 196-99; Doc. 14-7 pp. 40-43). At his August 4, 2011, follow-up examination, Plaintiff reported that he was "doing well" and that the tingling has resolved from the fourth and fifth digits of his left hand. (Admin. Tr. 203; Doc. 14-7 p. 47). It was noted that Plaintiff would begin a home exercise program, and was still awaiting authorization for a left shoulder arthroscopy. At his September 8, 2011, follow-up examination, it was noted that Plaintiff was much improved, but that his shoulder still bothered him at 90 degrees of abduction and flexion with positive impingement. (Admin. Tr. 204; Doc. 14-7 p. 48).

On September 7, 2011, Plaintiff was examined by nontreating internist, Dr. Muthiah. (Admin. Tr. 178-187; Doc. 14-7 pp. 22-31). On examination Dr. Muthiah noted that Plaintiff exhibited tenderness in the lower cervical region of his spine, and in the left shoulder region. Dr. Muthiah reported the impression of cervical myofascial pain, left shoulder pain, lumbar myofascial pain, and uncontrolled hypertension. Based on his examination and review of the April 2010 MRI Dr. Muthiah opined that Plaintiff could: lift or carry up to twenty pounds occasionally and fifteen pounds frequently; stand and walk up to two hours per eight-hour workday; sit without limitation;

6

occasionally bend, kneel, stoop, crouch, balance, and climb. Dr. Muthiah also assessed that Plaintiff would have difficulty reaching and handling with his left arm due to his should injury and should avoid exposure to temperature extremes. In response to question submitted by the bureau of disability determination, Dr. Muthiah noted Plaintiff was able to get on and off the examination table, walk on his heels and toes, squat and rise, sit, bend, stand, walk, grasp. He also observed that Plaintiff's ability to lift is affected by his left shoulder pain, and that he had a positive straight leg raise test to 35 degrees in both the seated and supine positions.

Plaintiff's application for DIB was initially denied on September 15, 2011.

On October 24, 2011, Plaintiff presented to Dr. Baum and reported that his cubital tunnel release surgery was quite successful. (Admin. Tr. 205; Doc. 14-7 p. 49). Plaintiff did report some abnormal sensation at the area of his scar, but that it was not disabling for him.

On October 25, 2011, in a disability report, Plaintiff stated that he could not shower properly, tie his own shoes, or remain seated for too long due to back spasm. (Admin. Tr. 142-43; Doc. 14-6 pp. 27-28). He also reported that he has difficulty getting dressed without assistance.

On December 21, 2011, Plaintiff presented to Dr. Baum with complaints of continued pain in his left wrist, left shoulder, and lower back. (Admin. Tr. 206; Doc. 14-7 p. 50). On examination, Plaintiff exhibited positive tenderness and guarded range of motion of the left shoulder with abduction and flexion to 130 degrees, and had a reduced range of motion in his lumbar spine with spasm, tenderness, and positive Kemp's sign. Dr. Baum opined that Plaintiff was permanently disabled.

On February 29, 2012, Plaintiff presented to Dr. Baum with continued pain to the left shoulder and lumbar region. (Admin. Tr. 207; Doc. 14-7 p. 51). On examination Plaintiff exhibited positive tenderness and guarded range of motion of the left shoulder with abduction and flexion to

7

130 degrees, and had a reduced range of motion in his lumbar spine with spasm, guarding, and tenderness.

On April 11, 2012, Plaintiff presented to Dr. Baum and reported that he continued to have left shoulder pain. (Admin. Tr. 208; Doc. 14-7 p. 52). Dr. Baum reported that Plaintiff's cubital tunnel release was doing well, but that he remained disabled.

On June 14, 2012, an MRI of Plaintiff's left shoulder revealed left labral pathology with tearing coming down to the interior portion of the labrum, impingement tearing, degenerative changes within the labrum, and fissuring of the bicep tendon. (Admin. Tr. 210-11; Doc. 14-7 pp. 54-55).

On June 16, 2012, Plaintiff was examined by Dr. Baum, and a second orthopedic surgeon, Charles J. Pearlman. The examination notes reflect that the doctors jointly requested authorization of left shoulder arthroscopy with labral repair and OPUS. (Admin. Tr. 209; Doc. 14-7 p. 53).

On December 3, 2012, Dr. Baum completed a report describing Plaintiff's physical limitations. (Admin. Tr. 219-224; Doc. 14-7 pp. 63-68). Dr. Baum reported that he had been treating Plaintiff for over two years, and examined him on a monthly basis. Dr. Baum reported a current diagnosis of cervical spine multilevel HNP, lumbar derangement, status post left cubital tunnel release, and left shoulder labral tear; Plaintiff's prognosis was poor. He described Plaintiff symptoms as left shoulder pain, neck pain, low back pain, and wrist pain, and reported that his clinical findings of diffuse tenderness and spasm of paraspinal musculature, diminished range of motion in the lumbar spine, left shoulder, and wrist, and diffuse tenderness and spam to the cervical spine, and the lumbar, thoracic, and cervical MRIs support his assessment. Dr. Baum assessed that Plaintiff could: sit up to one hour at a time, and for a total of one hour per eight-hour workday; stand or walk up to one hour at a time and for a total of one hour per eight hour workday; occasionally lift or carry up to five

8

pounds; never stoop, kneel, crouch, crawl, climb, or reach; never use his hands for repetitive actions such as grasping, pushing or pulling, or fine manipulations; and never use his feet for repetitive movements such as pushing or pulling leg controls. The only explanation provided for these limitations was that Plaintiff was "totally disabled."

Plaintiff sought and was granted an opportunity to present his claims before an administrative law judge ("ALJ"). Plaintiff, with the assistance of counsel, appeared and testified at a hearing before ALJ Therese A. Hardiman in Wilkes-Barre, Pennsylvania on December 4, 2012. Impartial vocational expert ("VE") Michele C. Giorgio also appeared and testified. The ALJ denied Plaintiff's claim in a written decision dated February 19, 2013. (Admin. Tr. 12-22; Doc. 14-2 pp. 13-23).

Plaintiff reported that he experiences almost constant pain in his left arm, shoulder, back, and neck that radiates throughout the left side of his body. (Admin. Tr. 136-37; Doc. 14-6 pp. 21-22). He also reported that his prescribed medications reduce his pain for approximately three hours at a time, but have the unpleasant side-effect of gastro-intestinal discomfort. *Id.* Additionally, Plaintiff also uses a TENS machine twice per day, and applies heat or cold throughout the day for pain control. *Id.* In an undated adult function report form completed prior to the hearing, Plaintiff reported that his back and shoulder injuries affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use his hands. (Admin. Tr. 128-35; Doc. 14-6 pp. 13-20). Plaintiff testified that his house has two floors, but that he stays on the first floor, and that he does not lift objects heavier than a gallon of milk. (Admin. Tr. 45; Doc. 14-2 p. 46). In a pain questionnaire Plaintiff reported that his pain is triggered by bending, standing, walking, and temperature extremes. (Admin. Tr. 136; Doc. 14-6 p. 21). In his function report Plaintiff reported that he could walk ten to fifteen minutes before he needs to stop and rest but could not sit for "too long." (Admin. Tr. 132; Doc. 14-6 p. 17). Similarly, at his hearing Plaintiff testified that he could: sit up to forty-five minutes at one time

before he needs to stand; stand up to one hour before he needs to change positions; walk up to one quarter mile before he needs a rest; never reach overhead with his left arm. (Admin. Tr. 45-48; Doc. 14-2 pp. 46-49). Plaintiff also reported that he needs assistance to dress and bathe primarily due to his shoulder injury, and that his pain affects the quality of his sleep. (Admin. Tr. 44, 129-30; Doc. 14-2 p. 45, Doc. 14-6 pp. 14-15). Further, Plaintiff stated that he is limited in his ability to cook and perform household chores due to the limited range of motion in his left arm. *Id.*

Thereafter, Plaintiff sought review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review. Together with his request for review, Plaintiff submitted new evidence to the Appeals Council that was not before the ALJ when she issued her decision. (Admin. Tr. 4, 225-27; Doc. 14-2 p. 5, Doc. 14-7 p. 69-71). The Appeals Council denied Plaintiff's request for review on May 29, 2014.

Plaintiff initiated this action by filing a complaint on July 30, 2014, wherein he requested that this matter be remanded to conduct a new administrative hearing. (Doc. 1). The Commissioner filed her answer on September 30, 2014, in which she asserted that the final decision of the Commissioner is supported by substantial evidence. (Doc. 13). Together with her answer, the Commissioner filed a copy of the administrative record. (Doc. 14). Having been fully briefed by the parties, this matter is now ripe for disposition. (Docs. 15, 16, 17).

II.   **DISCUSSION**

A.   STANDARD OF REVIEW

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators – the ALJ and this court. At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this framework, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520. Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his

or her past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. §404.1512; *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); *Mason*, 994 F.2d at 1064.

Once a final decision is issued by the Commissioner, and that decision is appealed to this Court, our review of the Commissioner's final decision is limited to determining whether the findings of the final decision maker – the ALJ in this case – are supported by substantial evidence in the record, as it was developed before that decision maker. *See* 42 U.S.C. § 405(g)(sentence five); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason*, 994 F.2d at 1064. But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is

supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B. THE ALJ'S DECISION DENYING BENEFITS

In her written decision denying Plaintiff's claim for benefits, the ALJ proceeded through each step of the five-step sequential evaluation process. The ALJ also determined that Plaintiff meets the insured status requirement of Title II of the Social Security Act through December 31, 2015. (Admin. Tr. 14; Doc. 14-2 p. 15). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 16, 2010, his alleged onset date. *Id.* At step two, the ALJ found that Plaintiff has the medically determinable severe impairments of degenerative disc disease/degenerative joint disease of the cervical spine, thoracic spine, and lumbar spine, left shoulder labral tear with impingement, and left cubital tunnel syndrome/status-post cubital tunnel release. (Admin. Tr. 14-15; Doc. 14-2 pp. 15-16). At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 15; Doc. 14-2 p. 16).

Before beginning step four, the ALJ assessed Plaintiff's RFC. In doing so, the ALJ is required to consider the opinion evidence of record, and Plaintiff's own testimony together with the

13

record as a whole in accordance with the mandates of 20 C.F.R. §§404.1527, 404.1529 and SSRs 96-2p, 96-4p, 96-5p, 96-6p, 96-7p, and 06-03p. In this case, the ALJ found that Plaintiff could engage in light work as defined by 20 C.F.R. §404.1567(b), except that Plaintiff:

> Is not able to use his left nondominant upper extremity for pushing and/or pulling, but has no limitation of the right upper extremity. The claimant can occasionally climb, balance, and stoop. He can never climb on ladders, ropes, and scaffolding. The claimant can occasionally use his left nondominant upper extremity for reaching, but he cannot use the left nondominant extremity for overhead reaching. He has no limitation to his right upper extremity for reaching overhead. The claimant must avoid temperature extremes, humidity, vibration, and hazards.

(Admin. Tr. 15-20; Doc. 14-2 pp. 16-21).

The ALJ relied on testimony by a VE to support her findings at steps four and five. At the hearing, the VE testified that an individual with the same vocational characteristics as Plaintiff, and the above RFC, could not engage in Plaintiff's past work as a carpenter. (Admin. Tr. 54; Doc. 14-2 p. 55). The VE also testified, however, that such an individual could perform other work, including work as a counter clerk/rental clerk, receptionist/information clerk, or usher/lobby attendant/ticket taker. *Id.* The VE testified that, collectively, these positions exist in approximately 12,267 jobs in the state economy. *Id.* Based on this testimony, the ALJ found in Plaintiff's favor at step four and concluded that Plaintiff was unable to engage in his past relevant work. (Admin. Tr. 20; Doc. 14-2 p. 21). At step five, however, the ALJ found that Plaintiff was "not disabled" because Plaintiff's impairments do not prevent him from engaging in "other work" that exists in significant number. (Admin. Tr. 21-22; Doc. 14-2 pp. 22-23).

C.  THE ALJ'S ASSESSMENT OF THE MEDICAL EVIDENCE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

The Social Security regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including … symptoms, diagnosis and prognosis, what

14

[the claimant] can still do despite [his or her] impairment(s), and … physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). The Social Security Regulations define "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R §404.1513.

It is clearly within the ALJ's authority to choose whom to credit when the record contains conflicting medical opinions. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). However, since it is apparent that the ALJ "cannot reject evidence for no reason or the wrong reason." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)(*citing Mason*, 994 F.2d at 1066), the ALJ is also required to provide an explanation as to why opinion evidence by acceptable medical sources has been rejected so that a reviewing court can determine whether the reasons for rejection were proper. *Cotter v. Harris*, 642 F.2d 700, 704, 707 (3d Cir. 1981).

The Social Security Rulings and Regulations provide a framework under which medical opinion evidence must be considered. At the outset, the Court notes that the Social Security Regulations discuss the nature of an acceptable medical source's treatment relationship with the claimant in terms of three broad categories: treating; examining; and non-examining.[1] The Social Security Regulations also express a clear preference for opinions by treating sources. *See Morales,* 225 F.3d at 317 ("a cardinal principle guiding disability eligibility determinations is that the ALJ

---

[1] A treating source is defined as an acceptable medical source who provides or has provided a claimant with medical treatment or evaluation, and who has or had an ongoing treatment relationship with the claimant. 20 C.F.R. §404.1502. A nontreating source is defined as an acceptable medical source that has examined the claimant but did not have an ongoing treatment relationship – like a consultative examiner. *Id.* A nonexamining source is defined as an acceptable medical source that has not examined the claimant, but has provided an opinion in the case – like a state agency reviewing doctor. *Id.*

accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation over a prolonged period of time."). Pursuant to 20 C.F.R. §404.1527(c)(2):

> if [the ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight.

*Id.*; *see also* SSR 96-2p, 1996 WL 374188. Furthermore, finding that the medical opinion of a treating source is not entitled to controlling weight does not mean the opinion should be rejected. SSR 96-2p, 1996 WL 374188, at *1. In many cases, a treating source's medical opinion will be entitled to great deference even where it is found to be non-controlling. *Id.*

Where the ALJ finds that no treating source opinion is entitled to controlling weight, the regulations provide that the weight of all non-controlling opinions by treating, examining, and non-examining medical sources should be evaluated based on the following factors: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §404.1527(c). In addition, the ALJ should consider any other factors that tend to support or contradict the opinion that were brought to his or her attention. 20 C.F.R. §404.1527(c)(6).

Among other things, Plaintiff alleges that the ALJ's RFC assessment and ultimate conclusion on the issue of disability are not supported by substantial evidence due to several flaws in her evaluation of the medical opinion evidence of record. In response, the Commissioner asserts that the ALJ provided good reasons for declining to endorse Dr. Baum's medical opinion, and for rejecting

Dr. Muthiah's assessment that Plaintiff would have a reduced capacity for standing and walking due to his impairments.

As explained below, the Court finds that although the reasons stated by the ALJ for discounting these opinions are within the bounds of what is permissible under the applicable regulations, *see* 20 C.F.R. §404.1527(c)(4)("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings … [and] the better an explanation a source provides for an opinion, the more weight we will give that opinion."), when reviewed together with the record as a whole the ALJ's cited rationale is simply not supported by substantial evidence.

**1.   The ALJ's Decision to Discount the Opinions Expressed by Dr. Baum in his December 2012 Physician's Report are Not Supported by Substantial Evidence**

In her decision the ALJ accorded "little" weight to the opinions by treating orthopedic surgeon, Dr. Baum. The ALJ explained that:

> There is no explanation in terms of signs or laboratory findings to support any of Dr. Baum's opinions and they are not well-supported in the records of the doctor or the record as a whole. While the doctor intimates in one of the opinions that the claimant cannot do manual work and this is given more weight, he is not, in fact, disabled under the Social Security guidelines because he[sic] while he may not be able to perform his past relevant work his retained capacity does not prevent other work. Therefore, as a whole, little weight can be afforded these opinions as they are clearly not well supported in the opinions, the doctors' examination findings nor the record as a whole. Further, like all opinions as to the ultimate determination of disability, this is clearly reserved to the Commissioner.

(Admin. Tr. 20; Doc. 14-2 p. 21). Although Plaintiff concedes that Dr. Baum's use of the term "disabled" in his treatment notes prior to the date Plaintiff filed his application for benefits did not refer to the statutory definition of disability under the Social Security Act, Plaintiff asserts that the ALJ's determination Dr. Baum's opinions were not well-supported in the opinions of record, his

own treatment notes, or the record as a whole is not supported by substantial evidence. (Doc. 15 p. 14). To the extent that this argument relates to the opinions expressed by Dr. Baum in his December 2012 Physician's Report, the Court agrees.

At the outset, the Court notes that the applicable regulations define "signs" as anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements (symptoms)." 20 C.F.R. §404.1528(b). "Laboratory findings" are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." 20 C.F.R. §404.1528(c). MRIs and other roentgenological studies are medically acceptable laboratory diagnostic techniques. *Id.*

In his impairment questionnaire, Dr. Baum was asked to describe the clinical findings, laboratory results, and tests that supported his assessment. With respect to clinical findings, Dr. Baum noted that Plaintiff exhibited diffuse tenderness and spasm of paraspinal musculature secondary to diminished range of motion to his lumbar spine, a limited range of motion in his left shoulder, a diminished range of motion in both wrists, and diffuse tenderness and spasm to his cervical spine. (Admin. Tr. 219; Doc. 14-7 p. 63). With respect to laboratory findings, Dr. Baum noted that an MRI of Plaintiff's lumbar spine revealed spondylolisthesis at L5-S1 with central disc herniation, and that an MRI revealed disc herniation at T5-T6 and T7-T8, and in his diagnosis noted that Plaintiff's left shoulder labral tear had been confirmed by an MRI. (Admin. Tr. 220; Doc. 14-7 p. 64). Thus, as it relates to Dr. Baum's December 2012 report, the Court finds that the ALJ's observation that the doctor made no attempt to explain his findings in terms of "signs" or "laboratory findings" is unsupported.

Next the ALJ noted that Dr. Baum's opinions are not well-supported by his own records. SSR 96-2p provides that the issue of whether a medical opinion is "well-supported" depends on the

particular facts of each case and requires a basic understanding of the clinical signs and laboratory findings in the case record and what they signify. 1996 WL 374188, at *2. Although in many instances the significance of certain clinical signs or laboratory findings may be obvious, this is not always the case. Here, the Court's review of the record reveals that although the clinical signs and laboratory findings identified by Dr. Baum in his report are consistent with his treatment records and the result of the cervical, thoracic, lumbar, and left shoulder MRIs, the medical significance of these clinical signs and MRIs, as they relate to the functional effects of Plaintiff's impairments, are not immediately apparent. While the Court can reasonably assume from these records, and the fact that Plaintiff has undergone multiple rounds of steroid injections in his back, neck, and shoulder, that Plaintiff is in some amount of pain, it is impossible to estimate the degree of pain conjured by postural movements commonly required in the workplace (such as prolonged sitting or standing).

Unfortunately, a review of the only other medical opinion of record fails to clarify this issue. In his report, Dr. Muthiah remarked that prior to his examination he had access to Dr. Baum's initial consultation report dated April 27, 2010, and an MRI of Plaintiff's cervical spine. (Admin. Tr. 178; Doc. 14-7 p. 22). Based on Dr. Muthiah's representation, the Court may reasonably infer that he did not have access to the MRIs of Plaintiff's thoracic spine, lumbar spine, or left elbow, or the bulk of Dr. Baum's treatment records when he rendered his opinion. The fact that Dr. Muthiah opined that Plaintiff was more restricted in his ability to stand or walk for prolonged periods than was found by the ALJ, even without the benefit of reviewing MRIs of the other affected areas of Plaintiff's spine and left shoulder, certainly lends a degree credibility to certain aspects of Dr. Baum's assessment. However, because Dr. Muthiah did not have access to this evidence, the Court cannot conclude that his assessment provides any additional insight into the medical significance of the clinical signs and laboratory findings identified by Dr. Baum in support of his opinion.

Based on the lack of specificity with respect to the clinical significance of the MRI evidence or of clinical signs catalogued by Dr. Baum over a span of years treating Plaintiff, the Court cannot conclude that the ALJ's determination that Dr. Baum's medical opinion is not well-supported by signs or laboratory findings is supported by substantial evidence. Moreover, the ALJ's explanation fails to provide any insight as to her basis for concluding that the above-mentioned signs and laboratory tests do not support Dr. Baum's assessment. On remand, the ALJ should engage in some discussion of significance of the "signs" and "laboratory findings" identified by Dr. Baum as they relate to the individual functional limitations contained in Dr. Baum's report in determining whether the opinion is supported by these clinical "signs" and "laboratory findings." Further, where there is any uncertainty as to the medical significance of these clinical signs and laboratory findings, the ALJ should be free to further develop the record as she deems necessary.

> **2. The ALJ's Decision to Accord "little" weight to Dr. Muthiah's opinion that Plaintiff has a reduced capacity for standing and walking during the workday is not supported by substantial evidence**

In her decision the ALJ accorded "some" weight to the opinion of nontreating internist Dr. Muthiah that Plaintiff could engage in a limited range of light work, and "little" weight to his reduction of standing and walking, and limitation to only occasional postural maneuvers beyond climbing ladders, ropes and scaffolding, stooping, and bending. (Admin. Tr. 20; Doc. 14-2 p. 21). The ALJ explained that Dr. Muthiah did not set forth any explanation in terms of signs or laboratory findings to support "all limitations opined." *Id.* Plaintiff asserts that the ALJ erred by relying on this opinion selectively and because she failed to cite any inconsistent objective medical evidence to support his decision to reject Dr. Muthiah's assessment of Plaintiff's reduced capacity to stand and walk. (Doc. 15 pp. 12-13).

With respect to his first allegation – that the ALJ erred by "cherry-picking" portions of Dr. Muthiah's opinion – the Court finds that Plaintiff's assertions are meritless. In support of his argument, Plaintiff relies on *Clayton v. Colvin*, a case from the Western District of Pennsylvania where the Court recognized that an ALJ may not "'cherry-pick' higher GAF [Global Assessment of Functioning] scores in his or her analysis while ignoring GAF scores that may support a disability." No. 14-400, 2014 WL 5439796, at *6 (W.D.Pa. Oct 24, 2014). While the Court agrees with the proposition that an ALJ cannot simply ignore significant probative evidence that does not support his or her conclusion, the ALJ is not bound to accept all aspects of an opinion where he or she also accords it some weight. *Wilkinson v. Comm'r of Soc. Sec.*, 558 Fed. App'x 254, 256 (3d Cir. 2014)("no rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the LJ gives the source's opinion as a whole 'significant' weight."); *see also Titterington v. Barnhart*, 174 Fed. App'x 6, 11 (3d Cir. 2006)("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."). The fact that an ALJ may permissibly deviate from a medical opinion does not excuse an ALJ's failure to properly explain or support his or her conclusions.

Plaintiff's second allegation – that the ALJ failed to explain or otherwise identify evidence supporting her decision to reject Dr. Muthiah's opinion that Plaintiff had a reduced capacity to stand or walk during the workday – has some merit. Performance of the full range of light work requires standing and walking (off and on) for a total of six hours per eight-hour workday. *See e.g.* SSR 83-10, 1983 WL 31251 at *5-6 (noting that the "frequent" lifting or carrying required to perform the full range of light work pursuant to 20 C.F.R. §404.1567(b) requires standing or walking for a total of six hours per eight-hour workday). Although the ALJ did not find that Plaintiff could perform the full range of light work, she did not include any limitation that would restrict the amount of standing

and walking required. Plaintiff accurately notes that, though they deviate on the extent of the limitation, Plaintiff's testimony and both medical opinions of record are consistent that Plaintiff has a reduced capacity to stand or walk for prolonged periods that would preclude the performance of a full range of light work. As for the objective evidence of record, as discussed above, the medical significance of the clinical signs and laboratory findings, as they relate to Plaintiff's reduced capacity to stand or walk for long periods, is not clear. However, because both physicians agree that Plaintiff's impairments would result in some restriction to Plaintiff's ability to stand or walk for extended periods, Plaintiff's testimony does not reveal that he routinely engages in any activity requiring prolonged standing or walking, and the ALJ has otherwise failed to identify or explain her basis for concluding otherwise, the Court cannot conclude that the ALJ's determination that Plaintiff retains the ability to stand or walk up to six hour per eight-hour workday is supported by substantial evidence. Accordingly, the Court finds that the ALJ's decision to accord "little" weight to the standing and walking limitations in Dr. Muthiah's opinion is not supported by substantial evidence.

### D. PLAINTIFF'S REMAINING ARGUMENTS

In his two remaining arguments, Plaintiff asserts that the ALJ's decision at step five, is not supported by substantial evidence because he discredited the extent of Plaintiff's allegations of pain without considering the ongoing surgical recommendations by Dr. Baum, (Doc. 15 p. 9-11), accorded too much significance to Plaintiff's receipt of unemployment benefits for a portion of the relevant period, (Doc. 15 pp. 8-9), and because the ALJ improperly relied on the VE's response to a

hypothetical question that did not adequately account for all of Plaintiff's credibly established limitations.[2] (Doc. 15 pp. 14-15).

With respect to Plaintiff's first allegation, that the ALJ improperly discounted the severity of Plaintiff's complaints of pain, the Court finds that the ALJ's determination is supported by substantial evidence despite the fact that his findings with respect to two factors were unsupported.

An ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness' demeanor and credibility. *Frazier v. Apfel*, No. 99-CV-715, 2000 WL 288246, at *9(E.D. Pa. Mar. 7, 2000)(*quoting Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531(6th Cir. 1997)). Furthermore, in making a finding about the credibility of a claimant's statements, the ALJ need not totally accept or totally reject the individual's statements. SSR 96-7p, 1996 WL 374186. The ALJ may find all, some, or none of the claimant's allegations to be credible, or may find a claimant's statements about the extent of his or her functional limitations to be credible but not to the degree alleged. *Id.*

The Social Security Rulings and Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. §404.1529; SSR 96-7p, 1996 WL 374186. First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying

---

[2] Plaintiff also alleges that the ALJ questioned Plaintiff's credibility due to his refusal to take stronger medications despite the fact that there is no evidence that stronger medications were sought or recommended. (Doc. 15 pp. 11). The ALJ does not cite this as a basis to discount Plaintiff's credibility, as such the Court finds that this argument lacks merit.

physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §404.1529(b); SSR 96-7p, 1996 WL 374186. During the second step of his or her credibility assessment, the adjudicator must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the adjudicator's evaluation of the entire case record. 20 C.F.R. §404.1529(c); SSR 96-7p, 1996 WL 374186. This includes, but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and "other medical sources"; and, information concerning the claimant's symptoms and how they affect his or her ability to work. *Id.* The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 96-7p, 1996 WL 374186. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §404.1529(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. *Id.*

In his decision, the ALJ found that Plaintiff's level of activity, application and receipt of unemployment benefits, benign objective findings, and routine and conservative care

undermined Plaintiff's allegations of disabling pain. (Admin. Tr. 20; Doc. 14-2 p. 21). Plaintiff contends that the ALJ erred in his consideration of Plaintiff's receipt of unemployment benefits and the characterization of Plaintiff's course of treatment as "routine and conservative." The Court agrees.

In his decision, the ALJ cites Plaintiff's receipt of unemployment benefits as inconsistent with a finding of disability, but did not explain whether he considered Plaintiff's application for unemployment compensation together with the totality of the circumstances. *See Brumbaugh v. Colvin*, No. 3:14-CV-888, 2014 WL 5325346 at *14-16 (M.D.Pa. Oct. 20, 2014)(finding that an ALJ's that unemployment benefits is inconsistent with the application for disability benefits is unsupported where there is no indication that the ALJ examined the totality of the circumstances in determining the significance of the claimant's application for unemployment benefits). Similarly, despite noting that Plaintiff's treating specialist was waiting for an authorization for surgery from the Workers' Compensation Board for much of the relevant period, he characterized Plaintiff's treatment as "routine and conservative."

In his reply brief Plaintiff adds that the ALJ's finding that his complaints are inconsistent with his level of activity is unsupported. (Doc. 17 pp. 1-4). The Court finds, however, the ALJ's assessment that Plaintiff's activities of watching sports, reading, attending church, and playing video games illustrate an ability to concentrate that could be viewed as inconsistent with the intensity of Plaintiff's reported pain. Because the ALJ's determination that Plaintiff's daily activities are inconsistent with Plaintiff is supported by the record, the Court must conclude that the ALJ's assessment that Plaintiff's subjective complaints of pain were not entirely credible is supported by substantial evidence. Nonetheless, because the Court has found an independent cause for remand, it is recommended that the ALJ revisit and properly explain his findings on

the issues of whether, based on the totality of the circumstances, Plaintiff's decision to apply for unemployment benefits is inconsistent with Plaintiff's complaints of pain, and whether, in light of Dr. Baum's surgical recommendation, Plaintiff's course of treatment is inconsistent with his complaints of pain.

Last, Plaintiff contends that the ALJ's decision at step five is unsupported because it was based on the VE's response to an incomplete hypothetical question. The Court finds that, because the ALJ must re-evaluate the medical evidence of record on remand, his errors in this regard, if any, may be corrected on remand. Therefore, it need not address this issue further.

III.    RECOMMENDATION

Based on the foregoing, the Court concludes that the final decision of the Commissioner denying Plaintiff's Title II application for Disability Insurance Benefits is not supported by substantial evidence, and recommends that the Commissioner's decision be **VACATED** and this case be **REMANDED** for a new administrative hearing.


Dated: July 31, 2015                              *s/ Karoline Mehalchick*
                                                  **KAROLINE MEHALCHICK**
                                                  **United States Magistrate Judge**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

John W. Klein II,

                    Plaintiff

          v.

Commissioner of SSA,

                    Defendant

CIVIL ACTION NO. 1:14-CV-01496

(CONNER, C.J.)
(MEHALCHICK, M.J.)

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **July 31, 2015**.

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: July 31, 2015**

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**